Filed 3/12/24  P. v. Johnson CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>BRIAN KEITH JOHNSON, JR.,<br><br>Defendant and Appellant. | C097856<br><br>(Super. Ct. No. STK-CR-FE-2017-0015416) |

Defendant Brian Keith Johnson, Jr., appeals from his conviction for, among other crimes, active participation in a criminal street gang.  (Pen. Code, § 186.22, subd. (a) [gang participation].)[1]  He raises multiple claims on appeal, including:  (1) insufficient evidence supports his conviction for gang participation because the jury did not find him guilty of certain other counts; (2) as a result of changes made to Penal Code section

---

[1]  Further undesignated statutory references are to the Penal Code.

1

186.22 by the enactment of Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 699, § 3) (Assembly Bill No. 333), his gang participation conviction must be reversed and dismissed; (3) reversal of several other counts of conviction is required pursuant to Penal Code section 1109, which was also added by Assembly Bill No. 333 and requires gang participation offenses to be tried separately from other counts not requiring gang evidence; (4) remand is required to allow the trial court to reconsider the admissibility of screenshots from a rap music video in light of newly enacted Evidence Code section 352.2, which provides for additional procedures and requires courts to consider additional factors before admitting evidence of creative expression; and (5) the trial court committed instructional error by requiring trial counsel to revise a slide used during closing argument to delete a definition of reasonable doubt as requiring "near certainty."

We agree that changes made to section 186.22 by Assembly Bill No. 333 require reversal of the gang participation conviction, although we will remand to the trial court to provide the prosecution with the opportunity to retry defendant on that count. We conclude the remainder of defendant's claims lack merit.

<strong>FACTS AND PROCEEDINGS</strong>

*The Shooting*

DeAngelo Montgomery and T.J. had a child in common, but the two did not get along well. In December 2016, T.J. was in a relationship with E.W., who was staying with T.J. and her family.

Montgomery had previously threatened T.J. and men she dated, including E.W. Montgomery came to T.J.'s house looking for E.W. in November 2016, and Montgomery had sent T.J. a Facebook message asking E.W. to "come outside."[2] Montgomery asked

_____

[2] The People's gang expert testified that the phrase "come outside" is a way to publicly shame another person or to show disrespect.

2

where E.W. lived, but T.J. refused to tell him because she feared Montgomery would harm E.W.  T.J. had seen pictures of Montgomery with guns on social media sites.

At around 8:30 p.m. on December 21, 2016, E.W. was shot while sitting on T.J.'s bed with his back facing an open window.  T.J. called 911 and told the operator that Montgomery shot E.W.  The following day, T.J. told E.W. that Montgomery shot him.  During a law enforcement interview, T.J. said the shooter was wearing a hoodie, she saw the gun, and the shooter was "Black."  However, T.J. testified at trial that she did not see the shooter.

A friend of Montgomery's told a detective that she had seen defendant near the scene of the shooting that evening, although she testified at trial that she had seen defendant near the scene of the shooting only earlier that day.

After his arrest, Montgomery wrote a letter to T.J. stating that defendant shot E.W. T.J. took a picture of the letter and E.W. messaged it to defendant's Facebook account.

Cellphone records reflected that defendant's and Montgomery's cell phones communicated multiple times before and after the shooting.  The two cell phones exchanged calls and text messages between approximately 7:36 and 7:53 p.m., including a 67-second call at 7:53 p.m.  Communication between the two phones resumed at 9:51 p.m., when a call from defendant's phone to Montgomery's lasted over three minutes. Cell phone location data indicated that defendant's cell phone was near the scene at the time of the shooting.

*Defendant's Arrest*

On November 20, 2017, Stockton Police Department Officer Joshua Day responded to a report of drug sales in Stockton and participated in defendant's arrest.  As Day approached defendant, he saw a 30-round extended magazine for a Glock pistol in defendant's pants pocket.  Defendant ran away when Day reached for the magazine, and another officer took him to the ground, where defendant struggled until other officers assisted.  After defendant was apprehended, officers saw a Smith and Wesson .40-caliber

3

firearm on the ground near him. In a subsequent interview, defendant stated that he found the gun and the magazine, and he picked them up because he thought "it would be cool to have a gun." A backpack defendant wore at the time of his arrest contained a digital scale and a baggy of marijuana weighing approximately two ounces.

*Gang Evidence*

Stockton Police Detective Kevin Knall testified as the prosecution's expert on African-American criminal street gangs. The Stockton Police Department documented the Conway Crips as a gang in 1989 and revalidated the gang as the Conway Gangsters in 2015. In Knall's opinion, the Conway Gangsters were an ongoing association of three or more persons sharing a common name or common identifying sign or symbol. (See former § 186.22, subd. (f) [defining criminal street gang at the time of trial in part as "any ongoing organization, association, or group of three or more persons . . . having a common name or common identifying sign or symbol"].)

Knall testified about African-American gang culture: "[G]ang culture largely is based on fear, respect, and power. So along those lines, everything they do, pretty much is aimed at achieving the respect of their peers, and that's based actually on fear." Gang members must respond to perceived insults to their reputation "because a gang member is preoccupied with maintaining their status." If a person falsely claimed to be a member of a gang, a gang member would confront that person; if the person claimed membership without the gang's permission, violence would result.

The People presented screenshots from a rap music video posted on YouTube called "All I Know is Hustle," which was created by Conway Gangsters member Maurice Johns, and in which multiple Conway Gangsters members appeared. The date the video was created or posted on YouTube was not offered into evidence at trial.

Knall testified that African-American gangs used rap videos to promote the gang; the videos depicted gang members displaying gang hand signs, singing lyrics about crimes they have committed, and disrespecting their rivals. Displaying large amounts of

4

cash in rap videos enhanced the reputation of the gang because gang culture "has a lot to do with attempting to secure finances and secure money," and "[f]lashing the money is showing how successful you have been, and the more money you have, obviously goes to show how much control and how much effect you have on the area to control it." Conway Gangsters feature the location of their gang's territory in their videos to promote the gang and the territories it claims.

Knall testified that defendant was a member of, and active participant in, the Conway Gangsters on December 21, 2016, the date E.W. was shot. He based that opinion on the content of defendant's social media accounts, which included pictures of defendant and other Conway Gangsters members displaying hand signs related to the gang, and references to the gang and areas it controlled. On the day before E.W. was shot, defendant posted on his Facebook page: "They an took my nigga Jonathan now a body what I'm craving Y'all don't hear me cuzz I'm piercing shit can't sit still with this stainless." Knall testified that Conway Gangsters member Jonathan Potter was murdered in December 2016, and defendant's post meant that he intended to commit murder with a firearm. Finally, at the time of his arrest, defendant wore a sweatshirt referring to the Conway Gangsters.

Knall opined that Conway Gangsters' primary activities included possession of illegal weapons, drug sales, auto theft, burglary, robbery, attempted murder, and murder. He reached that conclusion by reviewing certified legal documents related to criminal convictions of members of the gang. The prosecutor presented evidence of four predicate crimes through Knall's testimony and certified court documents to establish a pattern of criminal gang activity as required by section 186.22 at the time of trial.

First, Montgomery had been convicted of attempted murder related to the shooting in the current case. Knall testified that Montgomery was an active member of Conway Gangsters at the time of his crime, based on his admission that his crime was committed in association with, for the benefit of, or at the direction of a criminal street gang, and that

5

the rap video screenshot admitted at trial showed Montgomery wearing a shirt with a picture of a Conway Gangsters member who had been murdered and a reference to an area controlled by the Conway Gangsters that is known for drug sales.

Second, Maurice Johns was convicted of committing a second degree robbery on March 21, 2012. Knall opined that Johns was a member of the Conway Gangsters based on his appearance in the rap video screenshot, in which he was holding a large amount of cash. Knall testified that theft crimes, including robberies, generally benefit the gang by generating income that is shared among the gang members, which can then be used to buy food and pay rent, to buy firearms that can be used to commit crimes, to buy narcotics that can then be sold to generate additional income, and to create music videos to further promote the gang. Knall did not testify about any details of the robbery and did not testify that the robbery commonly benefitted the gang or that Johns was a Conway Gangsters member at the time he committed the offense.

Third, Knall testified that Rodney Carroll committed the offense of being a felon in possession of a firearm on June 20, 2015. Knall opined that Carroll was a member of Conway Gangsters on the basis that he was making a hand gesture representing Conway Gangsters in the rap video screenshot. Knall testified that firearms possession generally promoted the interest of criminal street gangs because firearms are used to commit crimes, and they are used as a show of force to potential rivals. Knall did not testify about the details of Carroll's crime, that the crime commonly benefitted the gang, or that Carroll was a gang member at the time of his crime.

Fourth, Knall testified that Apondo White committed the offense of carrying a concealed firearm on a person with a prior conviction on January 31, 2014. Knall testified that White was an active member of Conway Gangsters based on his appearance in the rap video screenshot. Knall did not testify that the crime was gang related, or that White was a gang member at the time of his crime.

6

When presented with a hypothetical scenario mirroring the facts of the shooting, Knall opined that the shooting was committed in association with and for the benefit of a criminal street gang. He testified that crimes of violence "boost the status reputation of an individual gang member of the community, as well as the entire gang. And by doing that, it prevents or decreases the likelihood that in the future, somebody will challenge them or threaten them." He noted that it would be an affront to a gang member's reputation if another man slept in a home where the gang member previously lived with the mother of the gang member's child, and there would be an expectation that the gang member would respond to such a situation.

*Procedural Background*

Defendant was charged with attempted willful, deliberate, and premeditated murder (Pen. Code, §§ 664, 187, subd. (a); count 1); assault with a semiautomatic firearm (*id.*, § 245, subd. (b); count 2); assault with a firearm (*id.*, § 245, subd. (a)(2); count 3); carrying a loaded firearm in a public place and not being the firearm's registered owner (*id.*, § 25850, subds. (a) & (c)(6); count 4); possessing a large capacity magazine (*id.*, § 32310; count 5); misdemeanor possession of marijuana for sale (Health & Saf. Code, § 11359, subd. (b); count 6); misdemeanor resisting a public officer (Pen. Code, § 148, subd. (a)(1); count 7); active participation in a criminal street gang (*id.*, § 186.22, subd. (a); count 8); and various sentencing enhancements.

A jury found defendant guilty on counts 4, 5, 7, and 8. It failed to reach verdicts on counts 1, 2, 3, and 6, and the court declared a mistrial as to those counts. Defendant subsequently pleaded no contest to one count of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)) as charged in an amended information.

Defendant argued in his sentencing brief that Assembly Bill No. 333 applied retroactively and required dismissal of his conviction for gang participation. The People initially conceded that the evidence supporting the gang participation count was insufficient to show a pattern of criminal gang activity under the law as amended by

Assembly Bill No. 333, but it later retracted its concession and argued that evidence adequately supported a finding of a pattern of gang activity. The trial court noted defendant had not filed a motion for a new trial, and it determined that it could not dismiss the conviction or order a retrial unless and until this court remanded the case back to it.

Accordingly, the trial court sentenced defendant to the upper term of four years in prison for his assault conviction, and concurrent terms of 16 months for counts 4, 5, and 8.[3]

Defendant timely filed notice of appeal. The case was fully briefed in December 2023, and was assigned to the current panel at the end of that month.

## DISCUSSION

### I

### *Sufficiency of the Evidence*

Defendant contends insufficient evidence supported the verdict on the gang participation count because that offense required the jury to find that he "willfully promote[d], further[ed], or assist[ed] in felonious criminal conduct" by members of the gang, and the jury failed to convict him on the felony counts that could have supported such a finding. The premise of his argument is that a guilty verdict on at least one of the other charged felonies was required to support a guilty verdict on the gang participation count. But that premise is misplaced; as we will explain, the law requires only that

---

[3] The trial court also orally imposed a concurrent sentence of 16 months for count 7--a misdemeanor. That appears to have been a misstatement, based on the court's initial (correct) observation that the maximum sentence for count 7 was one year in county jail, its stated *intent* to impose a concurrent sentence of one year for that count, and its reiteration that it planned to impose that sentence. Further, the minute order from the hearing reflects that the court sentenced defendant to a concurrent term of 365 days. Because we are remanding for possible retrial on the gang participation charge and a full resentencing, we need not and do not correct the error.

8

substantial evidence support each element of the charged offense.  Thus, this argument fails.  Defendant does not separately argue that insufficient evidence supports the verdict, and he has failed to satisfy his burden to demonstrate error.

A.  *Standard of Review*

In determining the sufficiency of the evidence, we review the whole record in the light most favorable to the judgment to decide whether substantial evidence supports the conviction.  (*Jackson v. Virginia* (1979) 443 U.S. 307, 319; *People v. Tully* (2012) 54 Cal.4th 952, 1006.)  Substantial evidence is " ' "evidence that is reasonable, credible, and of solid value" ' " so that a jury reasonably could have found the essential elements of the crime beyond a reasonable doubt.  (*Tully*, at p. 1006.)  We presume the existence of every fact supporting the judgment that the jury reasonably could have deduced from the evidence and make all reasonable inferences that support the judgment.  (*People v. Dalton* (2019) 7 Cal.5th 166, 243-244.)  Substantial evidence includes circumstantial evidence and the related reasonable inferences.  (*People v. Holt* (1997) 15 Cal.4th 619, 669.)

"Perhaps the most fundamental rule of appellate law is that the judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error.  [Citation.]  Thus, when a criminal defendant claims on appeal that his conviction was based on insufficient evidence of one or more of the elements of the crime of which he was convicted, we *must* begin with the presumption that the evidence of those elements was sufficient, and the defendant bears the burden of convincing us otherwise.  To meet that burden, it is not enough for the defendant to simply contend, 'without a statement or analysis of the evidence, . . . that the evidence is insufficient to support the judgment[ ] of conviction.'  [Citation.]  Rather, he must *affirmatively demonstrate* that the evidence is insufficient."  (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)

B. *Analysis*

Section 186.22, subdivision (a) describes a substantive offense where a person "who actively participates in a criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity," "willfully promotes, furthers, or assists in felonious criminal conduct by members of that gang." Here, the jury was instructed that "[f]elonious criminal conduct by members of the gang" referred to the conduct charged in counts 1 through 3: "Attempted murder, assault with a firearm, or assault with a semiautomatic firearm." The jury failed to reach verdicts as to those counts. Accordingly, defendant claims that because the jury did not find him guilty of the bases of the alleged "felonious criminal conduct," insufficient evidence supports the finding that he willfully promoted, furthered, or assisted such felonious conduct as required to find him guilty of the participation count.

Defendant offers no authority for the proposition that a guilty verdict on one or more of these counts was a legal prerequisite to conviction for gang participation. A substantive gang participation offense is not like an enhancement, which requires a guilty finding on an underlying offense before the enhancement may be imposed. Rather, the issue here is inconsistency, which is not fatal to guilty verdicts. (See *People v. Palmer* (2001) 24 Cal.4th 856, 860.) "[I]f an acquittal of one count is factually irreconcilable with a conviction on another, . . . effect is given to both." (*People v. Santamaria* (1994) 8 Cal.4th 903, 911.) The "[justice] system accepts the possibility that 'the jury arrived at an inconsistent conclusion through "mistake, compromise, or lenity." ' " (*People v. Guerra* (2009) 176 Cal.App.4th 933, 943.) "The United States Supreme Court has explained: '[A] criminal defendant . . . is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. This review should not be confused with the problems caused by inconsistent verdicts. Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination

10

of guilty beyond a reasonable doubt. [Citations.] This review should be independent of the jury's determination that evidence on another count was insufficient.' " (*People v. Lewis* (2001) 25 Cal.4th 610, 656, quoting *United States v. Powell* (1984) 469 U.S. 57, 67.)

Thus, the evidence supporting conviction on the gang participation count is not insufficient merely because the jury failed to find defendant guilty of counts 1, 2, or 3. Instead, the conviction must be upheld if there is substantial evidence in the record to support it, independent of the jury's findings on other counts. (See § 954 ["An acquittal of one or more counts shall not be deemed an acquittal of any other count"].)

Aside from his argument that the evidence was insufficient on the basis that he was not convicted of an underlying felony, with which we disagree, defendant does not argue that the evidence is insufficient to support the verdict on the gang participation count. Therefore, we conclude he has failed to satisfy his burden to demonstrate the evidence is insufficient. (*People v. Sanghera*, *supra*, 139 Cal.App.4th at p. 1573.)

II

*Assembly Bill No. 333*

Defendant contends the trial court erred when it instructed the jury under former section 186.22, which was amended by Assembly Bill No. 333 after his trial, requiring reversal of his gang participation conviction. The Attorney General acknowledges that the jury was not instructed as required following the enactment of Assembly Bill No. 333, but argues that reversal is unnecessary because there is compelling evidence that the jury would have found defendant guilty under the current version of section 186.22. We agree with the parties that the trial court erred, and we agree with defendant that reversal is required.

Defendant also contends reversal of his convictions for firearm and magazine possession and resisting arrest (counts 4, 5, and 7) is required because the trial court erroneously denied his request for bifurcation of the gang evidence from the remaining

11

counts under section 1109, which was also added to the Penal Code by Assembly Bill No. 333. There is a split of authority as to whether section 1109 applies retroactively to cases not yet final on appeal, but we need not take a position on that issue in this case, because we conclude any error here was harmless.

A. *Legal Background*

Section 186.22, former subdivision (f) defined a "criminal street gang" in relevant part as "any ongoing organization, association, or group of three or more persons, . . . whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (See Stats. 2017, ch. 561, § 179.) In turn, a "pattern of criminal gang activity" was defined as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of" two or more predicate offenses enumerated in section 186.22, former subdivision (e), "provided at least one of these offenses occurred after the effective date of this [Act] and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (*People v. Valencia* (2021) 11 Cal.5th 818, 829.)

Effective January 1, 2022, Assembly Bill No. 333 made significant modifications to the substantive and procedural requirements for establishing a gang participation offense under section 186.22. (See *People v. Tran* (2022) 13 Cal.5th 1169, 1206 (*Tran*); *People v. E.H.* (2022) 75 Cal.App.5th 467, 477-478 (*E.H.*); Stats. 2021 ch. 699, § 3.) "First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' [Citation.] Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill [No.] 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. [Citation.] Third, Assembly Bill [No.] 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that

12

(1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense.  [Citation.]  Fourth, Assembly Bill [No.] 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.' " (*Tran*, at p. 1206.)  "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)  Our Supreme Court has concluded that the ameliorative benefit of Assembly Bill No. 333's statutory amendments to section 186.22 applies to all cases not yet final on appeal. (*Tran*, at p. 1206.)

Recently, our Supreme Court resolved a split of authority in the appellate courts and clarified that the statutory reference to " 'collective[ ]' engagement in a pattern of criminal gang activity" does *not* mean "that each of the two predicate offenses must be committed in concert with other gang members and cannot be committed by individual gang members acting alone." (*People v. Clark*  (Feb. 22, 2024, S275746) __ Cal.5th __ [2024 Cal. LEXIS 774 at p. *3].)  However, the court held that the "collective engagement" requirement "requires a nexus between the individual predicate offenses and the gang as an organized, collective enterprise." (*Ibid.*)  In other words, the requirement "calls for an inquiry not just into how the predicate offenses benefited the gang, but also how the gang works together *as a gang*.  It calls for a showing of a connection, or nexus, between an offense committed by one or more gang members and the organization as a whole." (*Id.* at p. *25.)  "This organizational nexus may be shown by evidence linking the predicate offenses to the gang's organizational structure, meaning

13

its manner of governance; its primary activities; or its common goals and principles."
(*Ibid.*) While that inquiry is distinct from the "common benefit" inquiry, the court
recognized that the facts necessary to prove the two requirements will often overlap. (*Id.*
at p. *28.)

In addition to the substantive changes, Assembly Bill No. 333 added section 1109,
which provides a new procedure for trying gang enhancements under section 186.22.
(*E.H.*, *supra*, 75 Cal.App.5th at pp. 477-478; Stats. 2021, ch. 699, § 5.) As relevant here,
section 1109, subdivision (b) requires a gang participation offense to be tried separately
from all other counts "that do not otherwise require gang evidence as an element of the
crime."

Unlike the ameliorative benefits of Assembly Bill No. 333, the parties dispute
whether section 1109 applies retroactively, and the Courts of Appeal are split on this
issue. (Compare *People v. Burgos* (2022) 77 Cal.App.5th 550, 564-568, review granted
July 13, 2022, S274100, and *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1125-1131
with *People v. Perez* (2022) 78 Cal.App.5th 192, 207, review granted Aug. 17, 2022,
S275090, and *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65, review granted Aug. 17,
2022, S275341.) Most recently, our Supreme Court expressly declined to resolve the
split in *Tran*, *supra*, 13 Cal.5th at page 1208.

B. *Instructional Error*

Understandably, the trial court instructed the jury with the law as it existed at the
time of trial, which was before the enactment of Assembly Bill No. 333. Because the
modification of section 186.22 by Assembly Bill No. 333 applies retroactively to cases
not yet final on appeal, the court's instruction reflecting the law as it existed at the time of
trial was erroneous, and we must determine whether that error is harmless.

When a jury does not determine all elements of a charged offense because the
instructions omitted an element of the offense, the resulting prejudice is assessed under
the standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24. (*People v. Flood*

14

(1998) 18 Cal.4th 470, 491; *People v. Sek* (2022) 74 Cal.App.5th 657, 668 (*Sek*).) We apply this same standard of review when the jury was not instructed on an element because trial occurred before the effective date of the amendment adding the element. (*Tran*, *supra*, 13 Cal.5th at p. 1207; *E.H.*, *supra*, 75 Cal.App.5th at pp. 478-479.) Under the *Chapman* standard, the absence of instruction on the amended version of section 186.22 requires reversal unless "it appears beyond a reasonable doubt that the error did not contribute to th[e] jury's verdict." (*Flood*, at p. 504.) "The inquiry 'is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.' [Citation.] This standard is much higher than substantial evidence review. For example, courts have found harmless error under the *Chapman* standard where the missing element from an instruction was uncontested or proved as a matter of law." (*E.H.*, at pp. 479-480.) But where " 'the basis of the jury's verdict is not so clear,' " such as where "the prosecution presented evidence of both financial and reputational benefit, 'we cannot rule out the possibility that the jury relied on reputational benefit to the gang as its basis for finding the enhancements true.' " (*Id.* at p. 480.)

On this record, we cannot conclude beyond a reasonable doubt the jury would have reached the same result on the gang participation count had it been instructed correctly, with the current version of section 186.22. First, there was no evidence that the Conway Gangsters was an "organized" association as section 186.22 now defines the term "criminal street gang," and the jury was not asked to make such a finding.

Second, while there was *some* evidence supporting the requirement that the predicate offenses were committed for the common benefit of the gang, this element was not proved as a matter of law. (See *E.H.*, *supra*, 75 Cal.App.5th at p. 479 [where the prosecution presented evidence of both financial and reputational benefit, the omission was not harmless error].) Indeed, the jury was expressly instructed that the crimes did *not* need to be gang related. While Detective Knall testified that theft and firearm

15

possession offenses could, in theory, benefit the gang, he did not testify about how the offenses committed by Johns, Carroll, or White provided an actual benefit to the gang. (See *E.H.*, at pp. 473, 478-480 [finding that though the predicate offenses included crimes that could, in theory, provide a monetary benefit to the gang, the evidence did not show that these predicate offenses actually benefited the gang].)  "Not every crime committed by gang members is related to a gang." (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)  Moreover, the evidence did not show that Johns, Carroll, or White were Conway Gangsters members at the time they committed their offenses, and it is far from certain that commission of each offense commonly benefitted the gang where the perpetrator was not in the gang at the time.

Additionally, the jury could have based its finding on the reputational benefit to the gang.  Knall testified that "gang culture largely is based on fear, respect, and power. So along those lines, *everything they do*, pretty much is aimed at achieving the respect of their peers, and that's based actually on fear." (Italics added.)  We understand the Attorney General's argument that there was evidence presented that would have *permitted* the jury, were it asked to do so, to find the prosecution had satisfied the standard of proof under section 186.22 as amended by Assembly Bill No. 333.  However, "[t]o rule that the existence of evidence in the record that would permit a jury to make a particular finding means that the jury need not actually be asked to make that finding would usurp the jury's role and violate [defendant's] right to a jury trial on all the elements of the charged allegations." (*People v. Lopez* (2021) 73 Cal.App.5th 327, 346; see *Sek*, *supra*, 74 Cal.App.5th at pp. 668-669 [presentation of evidence that benefit to the gang was more than reputational does not rule out possibility that jury relied on reputational benefit as the basis for finding gang enhancements true].)

Third, the jury was instructed that it could consider the current charges as a predicate offense, which is no longer permissible.  (§ 186.22, subd. (e)(2).)  We recognize that the jury was unable to reach verdicts as to counts 1 through 3; thus, at first glance it

16

may appear unlikely that the jury considered those offenses when determining whether the People had proved a pattern of criminal gang activity. However, as we discussed *ante*, the jury found defendant guilty of the gang participation offense without finding him guilty on counts 1 through 3, suggesting that the jury at least considered the charged offenses when finding gang participation. Thus, it stands to reason that the jury may also have considered the currently charged offenses in finding the People had proved a pattern of gang activity.

Fourth, as recently explained by our Supreme Court, remand is required here because, "to establish collective engagement, the prosecution should have established a nexus between the offenses and the gang as a collective enterprise. There is no evidence in the record from which a jury could have found such a nexus beyond a reasonable doubt." (*People v. Clark*, *supra*, ___ Cal.5th at p. ___ [2024 Cal. LEXIS 774 at p. *29] .)

Based on the foregoing, the instructional error is not harmless beyond a reasonable doubt, and we reverse defendant's conviction for gang participation. Our decision does not bar the prosecution from retrying defendant on the participation count on remand. " 'Because we do not reverse based on the insufficiency of the evidence required to prove a violation of the statute as it read at the time of trial, the double jeopardy clause of the Constitution will not bar a retrial. [Citations.] " 'Where, as here, evidence is not introduced at trial because the law at that time would have rendered it irrelevant, the remand to prove that element is proper and the reviewing court does not treat the issue as one of sufficiency of the evidence.' " ' " (*Sek*, *supra*, 74 Cal.App.5th at p. 669.)

C. *Section 1109*

Even assuming without deciding that section 1109 applies retroactively to defendant's case, he was not prejudiced by the trial court's refusal to bifurcate the gang evidence from the charges not requiring presentation of gang-related evidence, as we next explain.

17

Initially, we reject defendant's contention that the failure to bifurcate constitutes structural error. Our Supreme Court recently concluded that the failure to bifurcate is subject to the standard articulated by *People v. Watson* (1956) 46 Cal.2d 818, 836, unless the failure to bifurcate rendered the trial fundamentally unfair, in which case the *Chapman* standard applies. (*Tran*, *supra*, 13 Cal.5th at pp. 1209-1210 [applying *Watson* standard].) Because defendant has made no effort to show the prosecution's use of gang evidence rendered the trial fundamentally unfair, and we do not see how it did, we will apply the *Watson* harmless error standard. (See *People v. Ramos, supra*, 77 Cal.App.5th at p. 1131 [applying *Watson* standard]; *E.H.*, *supra*, 75 Cal.App.5th at p. 480 [same].) Reversal is required under the *Watson* standard if "it is 'reasonably probable' he would have obtained a more favorable result if his trial had been bifurcated." (*E.H.*, *supra*, 75 Cal.App.5th at p. 480, quoting *Watson*, at p. 836.)

Defendant argues the fact that the jury found defendant guilty of gang participation despite not reaching verdicts as to counts 1 through 3 demonstrates it was significantly influenced by the prejudicial gang evidence, including his social media posts about being armed, tainting the jury's perception of him, and making it more likely that it would find him guilty of the three counts of conviction. Defendant acknowledges that the evidence against him *as to those counts* "appears relatively compelling." That is an understatement. Officer Day testified that he saw defendant with a 30-round firearm magazine for a Glock pistol in the pocket of his pants. Defendant fled from Day, and he continued to struggle after another officer took him to the ground. There was a Glock pistol on the ground near defendant after he was subdued. Further, defendant claimed that he found the firearm and the magazine at a nearby apartment complex, thereby *admitting* the firearm and magazine possession offenses.

Defendant adds that the jury's inability to reach a verdict on count 6--possessing marijuana for sale--demonstrates that it was persuaded by the gang and social media evidence because the evidence supporting count 6 was "virtually the same" as the

18

evidence supporting the firearm and magazine counts. We disagree. While we recognize that defendant was arrested with a bag of marijuana weighing two ounces and a digital scale, the jury could have found that the People had failed to prove defendant's intent to sell. In other words, that count is distinguishable from counts 4 and 5, which were proved by the very fact that defendant possessed the firearm and the magazine at the time of his arrest and bolstered by his admission. We conclude it is not reasonably probable that defendant would have obtained a more favorable result had counts 4,5, and 7--the firearm and magazine possession and resisting arrest charges--been bifurcated from the gang-related evidence.

### III

*Evidence Code Section 352.2*

Defendant contends newly enacted Evidence Code section 352.2 retroactively applies to his case and requires that the matter be remanded to the trial court to allow it to consider the admissibility of the rap video screenshots under that statute. The Attorney General responds that Evidence Code section 352.2 does not apply retroactively, and we agree.

Effective January 1, 2023, Evidence Code section 352.2 provides for additional procedures, and requires the court to consider additional factors, before admitting evidence of creative expression under Evidence Code section 352. In enacting the statute, the Legislature stated its intent to ensure that "an accused person's creative expression will not be used to introduce stereotypes or activate bias against the defendant, nor as character or propensity evidence; and to recognize that the use of rap lyrics and other creative expression as circumstantial evidence of motive or intent is not a sufficient justification to overcome substantial evidence that the introduction of rap lyrics creates a substantial risk of unfair prejudice." (Stats. 2022, ch. 973, § 1, subd. (b).)

Courts of Appeal are split on whether Evidence Code section 352.2 applies retroactively. (Compare *People v. Venable* (2023) 88 Cal.App.5th 445, 448, review

granted May 17, 2023, S279081 [retroactive] with *People v. Ramos* (2023) 90 Cal.App.5th 578, 581, 596 (*Ramos*), review granted Jul. 12, 2023, S280073 [not retroactive].) Most recently, this court agreed with the conclusion in *Ramos*. (*People v. Slaton* (2023) 95 Cal.App.5th 363, review granted Nov. 15, 2023, S282047). We agree with the decisions in *Ramos* and *Slaton*.

"The general rule is that 'when there is nothing to indicate a contrary intent in a statute it will be presumed that the Legislature intended the statute to operate prospectively and not retroactively.' (*In re Estrada* (1965) 63 Cal.2d 740, 746[].) 'Courts look to the Legislature's intent in order to determine if a law is meant to apply retroactively.' (*People v. Frahs* (2020) 9 Cal.5th 618, 627 [].) Here, neither the text of Evidence Code section 352.2 itself, nor the Legislature's findings and declarations, give any express indication that the Legislature intended Evidence Code section 352.2 to apply retroactively to nonfinal cases." (*Ramos*, *supra*, 90 Cal.App.5th at pp. 592-593.)

In *Estrada*, our Supreme Court recognized an exception to the general rule; namely, that "amendatory statutes that lessen the punishment for criminal conduct are ordinarily intended to apply retroactively." (*Ramos*, *supra*, 90 Cal.App.5th at p. 593.) When *Estrada* applies, "it covers 'all cases that are not yet final as of the legislation's effective date." (*Ibid.*) In *Frahs*, our Supreme Court outlined the situations in which *Estrada*'s retroactivity rule has been applied, including statutes governing penalty enhancements as well as substantive offenses, statutes making reduced punishment *possible*, and a statute that " 'ameliorated the possible punishment for a class of persons.' " (*People v. Frahs*, *supra*, 9 Cal.5th at p. 629, italics omitted.)

Evidence Code section 352.2, however, "is not a statute that creates the possibility of *lesser punishment* or any other type of more lenient treatment. It is also not a statute that *reduces criminal liability*, such as by altering the substantive requirements for a conviction or expanding a defense." (*Ramos*, *supra*, 90 Cal.App.5th 595; see *People v. Slaton*, *supra*, 95 Cal.App.5th at p. 372 [Evid. Code, § 352.2 "is not ' "analogous" to the

20

*Estrada* situation' "].)  Instead, the statute "was enacted to prevent the admission of unfairly prejudicial evidence when not warranted in the circumstances of a particular case." (*Ramos*, at p. 596.)  "[I]t is a neutral rule at that, limiting a defendant's ability to present a person's creative expression just as much as the prosecution's ability to present this type of evidence." (*Slaton*, at p. 373.)  "It is therefore not an ameliorative enactment within the meaning of *Estrada*," and not subject to the *Estrada* exception.  (*Ramos*, at p. 596.)  Because the statute does not apply retroactively to defendant's case, remand is not required on that basis.

IV

*Reasonable Doubt Standard*

Defendant contends that the trial court committed instructional error by requiring trial counsel to revise a slide he was using during closing argument to delete a definition of the reasonable doubt standard as a "near certainty."  We disagree.

A. *Procedural Background*

During closing argument, trial counsel presented a slide that defined the beyond a reasonable doubt standard as requiring a level of "near certainty."  Along with the slide, counsel argued:  "So this is CALCRIM [No.] 220 that is now up on the screen for you. So whenever the Judge tells you the People must prove something, they must prove it beyond a reasonable doubt unless the Judge tells you otherwise.  I don't believe you're going to see otherwise.

"Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true.  In other words, and you will never doubt it, not now, not later.  But what is proof beyond a reasonable doubt?  There are many -- younger attorneys usually will talk about and make analogies to all kinds of different things and sometimes spend 20 minutes setting it up.  I watched this one kid talk about for 30 minutes, the planks and boards must go between two mountains, and if one of them is

21

missing, you fall through.  The links aren't there to have proof beyond a reasonable doubt.  Took him 30 minutes.

"But when I look at what proof beyond a reasonable doubt is, you really just have to look at it within yourself.  If you believe you're a reasonable person and you have a doubt, the People haven't proved it beyond a reasonable doubt.  It's basically some type of reason if you believe you're a reasonable person. . . .

"The District Attorney has the burden of proof, as he so stated.  That means the defense does not have to prove anything at all.  If questions arise from the evidence, you have to look at the government.  What did the government not convince me of?  Why do I have this question?  What is not proven to me?  Too many times have I heard jurors from past cases or in courses or classes talking about well, the defense didn't prove it.  Wrong, sorry.  I'm not trying to be disrespectful, but it's wrong.  If there's any questions at all what the government not showing or prove to you --"

The trial court interrupted counsel and asked counsel and the prosecutor to approach the bench.  The court indicated that the slide's definition of the beyond a reasonable doubt standard as a "near certainty" conflicted with its ruling in limine that "if they [the jury] had a question about that, they could send a question out and then we would get together and decide what the interpretation is of that."[4]  Counsel stated he did not intend to, nor did he believe that he had, violated an in limine order, and indicated that our Supreme Court had defined the standard of proof as a "near certainty."  The court disagreed and reiterated that it had ruled in limine that the parties must wait until the jury asked a question before interpreting the standard.  The court required counsel to edit the slide to remove the "near certainty" definition.

---

[4]  Neither we nor the parties have identified an in limine ruling with which the slide conflicted.

Thereafter, counsel argued that the beyond a reasonable doubt standard is "a very high standard" and noted that the jury would have the instruction during its deliberations. He added that the standard is "a level of certainty that would allow you to convict anybody based on the evidence. If you are a reasonable person and have a doubt, then it is not enough to convict."

In reply, the prosecutor argued: "[Defense counsel] says, if you're a reasonable person and you have a doubt, that's reasonable doubt. No, that's not the law. The doubt has to be reasonable and based on the evidence. . . . You can use your imagination and think of a possible explanation for something and say, I'm a reasonable person, that gives me a possible doubt, reasonable doubt. That's not how it works, that's not the law. [¶] Beyond a reasonable doubt is not a new standard. It's the same standard under which every person convicted in the history of this country has been convicted. . . . [¶] You decide if there's a reasonable doubt based on the evidence . . . ."

The trial court instructed the jury with CALCRIM No. 220 that defendant was presumed innocent, and this presumption required the prosecution to prove defendant was guilty of the charges beyond a reasonable doubt. The instruction provided the standard definition of reasonable doubt: "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt." (See CALCRIM No. 220.) The jury was also instructed with CALCRIM No. 200, which directed the jury to follow the law as explained in the written instructions. Prior to deliberations, the jury was provided a packet of written instructions, which included CALCRIM Nos. 200 and 220.

B. *Standard of Review*

We review claims of instructional error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) "When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context

with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner." (*People v. Wilson* (2008) 44 Cal.4th 758, 803 (*Wilson*).) "We interpret the instructions so as to support the judgment if they are reasonably susceptible to such interpretation, and we presume jurors can understand and correlate all instructions given." (*People v. Vang* (2009) 171 Cal.App.4th 1120, 1129.)

C. *Legal Background*

"Under the due process clauses of the Fifth and Fourteenth Amendments, the prosecution must prove a defendant's guilt of a criminal offense beyond a reasonable doubt, and a trial court must so inform the jury." (*People v. Aranda* (2012) 55 Cal.4th 342, 356.) Section 1096 defines reasonable doubt as follows: " 'It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.' "

However, although the "beyond a reasonable doubt standard is a requirement of due process, . . . the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. [Citation.] Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, [citation], the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. [Citation.] Rather, 'taken as a whole, the instructions [must] correctly convey the concept of reasonable doubt to the jury.' " (*Victor v. Nebraska* (1994) 511 U.S. 1, 5; see also *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 839-840.) "What matters, for federal constitutional purposes, is 'whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on' insufficient proof." (*Daveggio and Michaud*, at p. 840.) Accordingly, the court *may*, but is not required to, read section

24

1096 to the jury, and "no further instruction on the subject of the presumption of innocence or defining reasonable doubt need be given." (§ 1096a; *People v. Freeman* (1994) 8 Cal.4th 450, 503.)

D. *Analysis*

Defendant contends the trial court's directive to remove the definition of the reasonable doubt standard as a "near certainty" amounted to an implied or indirect instruction to the jury that the reasonable doubt standard did *not* require "near certainty" to find him guilty. He contends the jurors would have used the court's implicit instruction as another " 'tool' to better understand or interpret the beyond a reasonable doubt standard as it was articulated in CALCRIM No. 220," resulting in the standard being " 'watered down' " by the court's incorrect commentary on the standard.

At the outset, we recognize that several older cases have equated proof beyond a reasonable doubt with "near certainty." (*Jackson v. Virginia*, *supra*, 443 U.S. at p. 315 ["a subjective state of near certitude"]; *People v. Hall* (1964) 62 Cal.2d 104, 112 ["To justify a criminal conviction, the trier of fact must be reasonably persuaded to a near certainty"]; *People v. Thompson* (1980) 27 Cal.3d 303, 324 [quoting *Hall*]; *People v. Reyes* (1974) 12 Cal.3d 486, 500 [same]; *People v. Redmond* (1969) 71 Cal.2d 745, 756 [same].) Additionally, section 1096 previously included the language "to a moral certainty," although that phrase was removed from the statute in 1995. (See *People v. Brown* (2004) 33 Cal.4th 382, 390-391; Stats. 1995, ch. 46, § 1.)

However, we disagree with defendant that there is a reasonable likelihood that the jury applied the instructions, considered as a whole, in an impermissible manner. (*Wilson*, *supra*, 44 Cal.4th at p. 803.) First, the trial court did not make any affirmative statement to the jury that the reasonable doubt standard required anything less than a near certainty. At most, requiring counsel to edit the slide including the "near certainty" definition conveyed to the jury that a "near certainty" was not an accepted definition of the standard. But the court did not take the additional, affirmative step of defining the

25

standard in a way that informed the jury that some other, lesser standard was applicable. For example, the court did not suggest a weighing process akin to the standard for civil trials (*People v. Garcia* (1975) 54 Cal.App.3d 61, 63), or explain that reasonable doubt must be founded on "*some good reason*" or "such doubt as you are able to find a *reason for in the evidence*" (*People v. Simpson* (1954) 43 Cal.2d 553, 565).

Second, the instructions the court provided to the jury adequately instructed with the proper standard. As we have discussed, the court instructed the jury orally and in writing with CALCRIM No. 220, and it instructed with CALCRIM No. 200 that the jury must follow the law as provided in the written instructions. CALCRIM No. 220 has been repeatedly held to sufficiently convey the high level of certainty to find a defendant guilty of a crime beyond a reasonable doubt. For example, a panel of this court observed: "The modifier 'abiding' informs the juror his conviction of guilt must be more than a strong and convincing belief. Use of the term 'abiding' tells the juror his conviction must be of a 'lasting, permanent nature,' it informs him 'as to how strongly and *deeply* his conviction must be *held*.' " (*People v. Zepeda* (2008) 167 Cal.App.4th 25, 30-31 [finding the "phrase, 'proof that leaves *you* with an abiding conviction that the charge is true,' unmistakably conveys the conviction's subjective nature and the very high level of certainty required" (*id.*, at p. 31)].) In *People v. Pierce* (2009) 172 Cal.App.4th 567, 573, the court recognized that "[t]he United States Supreme Court and the California Supreme Court, respectively, have described 'an abiding conviction' as one that is 'settled and fixed' [citation] and one that is 'lasting [and] permanent.' " (See also *People v. Light* (1996) 44 Cal.App.4th 879, 885 [" 'abiding conviction' " adequately conveys "the requirement that the jurors' belief in the truth of the charge must be both long lasting and deeply felt"].) In *People v. Carrillo* (2008) 163 Cal.App.4th 1028, the court held that it was not error for the trial court to refuse to modify CALCRIM No. 220 to state that an " 'abiding conviction' " means " 'convincing you to a near certainty of the truth of the

26

charge' " on the basis that the propriety of the instruction had been upheld many times. (*Carrillo*, at p. 1039.)

Thus, even if the trial court's directive to trial counsel could be construed as an oral " 'implied' or indirect instruction" regarding the applicable standard, the court expressly and properly instructed the jury with a widely accepted definition of the applicable standard. To the extent the " 'implied' or indirect instruction" oral instruction conflicted with the written instructions, we assume the jury followed the written instructions, particularly when, as here, the jury was instructed that the written instructions are controlling. (*People v. Grimes* (2016) 1 Cal.5th 698, 729; *Wilson*, *supra*, 44 Cal.4th at p. 803 [we presume the jury understood and followed the court's written instructions].)

Third, both parties were generally entitled to, and did, argue the reasonable doubt standard to the jury. Defense counsel observed that the People had the burden of proof, and that the defense was not required to prove anything. He explained while displaying CALCRIM No. 220 on a slide that "whenever the Judge tells you that the People must prove something, they must prove it beyond a reasonable doubt." He clarified that "[p]roof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. In other words, and you will never doubt it, not now, not later." He added that "[i]f you believe you're a reasonable person and you have a doubt, the People haven't proved it beyond a reasonable doubt. It's basically some type of reason if you believe you're a reasonable person." After editing the slide to remove the "near certainty" definition, counsel added that the standard is "a very high standard," and noted that the jury would have the written instruction as a reference during its deliberations. Finally, he concluded by adding that the standard is "a level of certainty that would allow you to convict anybody based on the evidence. If you are a reasonable person and have a doubt, then it is not enough to convict."

The instructions as a whole correctly conveyed the concept of reasonable doubt to the jury and did not reduce the standard of proof in any meaningful way.

V

*Cumulative Error*

Defendant contends the cumulative prejudicial effect of multiple trial errors was sufficient to warrant remand for a new sentencing hearing. "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' " (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.) "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

As related to defendant's convictions for firearm and magazine possession and resisting arrest, we found no actual error, and any error in failing to bifurcate was harmless. Thus, we reject defendant's claim of cumulative error.

## DISPOSITION

Defendant's conviction for gang participation (count 8) is reversed.  The matter is remanded to the trial court to (1) provide the People an opportunity to retry the gang participation offense under the law as amended by Assembly Bill No. 333; and (2) after any trial, or on remand if the prosecution elects not to conduct a trial, conduct a full resentencing under current law.  In all other respects, we affirm the judgment.

/s/

Duarte, J.

We concur:

/s/

Robie, Acting P. J.

/s/

Ashworth, J. *

---

* Judge of the El Dorado County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.